UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

PRISCILLA SIMMONS,               )
                                 )
            Plaintiff,           )
                                 )
v.                               )     No.: 3:11-CV-303-TAV-HBG
                                 )
AMERICAN APARTMENT MANAGEMENT    )
COMPANY, INC.,                   )
                                 )
            Defendant.           )


## MEMORANDUM OPINION AND ORDER

This is an action for age discrimination, race discrimination, religious discrimination, and retaliation brought by Plaintiff, acting *pro se,* against her former employer, Defendant American Apartment Management Company, Inc. Before the court is Defendant's motion for summary judgment, to which Plaintiff has responded. The Court has carefully considered the parties' pleadings and supporting documents, all in light of the controlling law. For the reasons which follow, Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part**.

I.     **Background**

Defendant hired Plaintiff as the Assistant Site Manager for Green Hills Apartment complex in Knoxville, Tennessee, on July 31, 2006. Plaintiff was promoted to Site Manager at Atchley Apartments, a low income, Section 8 residential complex in Maryville, Tennessee, in February 2007. As Site Manager, Plaintiff was responsible for the condition of the property, including supervising the maintenance staff with authority

to discipline and make recommendations on hiring and firing. Plaintiff was also responsible for the residents, including making sure all paperwork was completed properly, verifying income and financial assistance eligibility, maintaining all resident files, complying with all Housing and Urban Development ("HUD") regulations, enforcing lease terms and house rules, and ensuring rent was paid on time. As part of Plaintiff's compensation, she was given a residence at Atchley Apartments [Doc. 29].

In late 2006, Dave Nagel, then Vice President of Defendant, began providing oversight and support to the properties in the East Tennessee area following the resignation of the Regional Property Manager, and as a result had direct responsibility for Plaintiff when she was serving as the interim and then permanent Site Manager at Atchley Apartments. During a meeting involving Nagel, Plaintiff, and Defendant's then President, Patty Ownby, Plaintiff alleges Nagel "chewed me like a piece of meat." Ownby counseled Nagel over the way he spoke with Plaintiff. *Id.*

In January 2007, Plaintiff was serving as interim Site Manager at Atchley Apartments. One of the residents at Atchley Apartments asked to change apartments due to an alleged carpet allergy her daughter had that was irritated by the carpet in her current apartment. Because the resident kept changing her request related to the move and the reasons for wanting to change apartments and then not wanting to change apartments, Nagel doubted the resident's veracity regarding the carpet allergy. The resident then approached Plaintiff about changing apartments and Plaintiff agreed that the resident could change to an apartment that was opening up on the ground floor. As a result of

2

Plaintiff's promise to the resident, Nagel agreed to the move as satisfaction of the resident's request for a reasonable accommodation for her daughter. Nagel requested Plaintiff, as the acting Site Manager, sign a reasonable accommodation letter for the resident's file, but Defendant claims that Plaintiff refused, claiming she did not know anything about the situation. Nagel issued a memorandum to Plaintiff about her alleged mishandling of the situation, detailing the events that led up to the reasonable accommodation letter. *Id.*

Plaintiff alleges Nagel yelled at her for her refusal to sign the reasonable accommodation letter and threatened her should she ever disobey one of his requests in the future. Plaintiff does not claim that Nagel used any racial slurs or racially charged language during this interaction. Plaintiff did ask Nagel not to speak to her in that fashion again. When Plaintiff informed Ownby of Nagel's conduct, Ownby said she would fire Nagel, but Plaintiff asked her not to do so. Following this incident, Nagel had no further supervisory responsibility for Plaintiff. *Id.*

In May 2006, Rusty Fleming was hired as the new President of Defendant following Ownby's retirement. On July 21, 2008, Terry Elliott was hired as the Regional Manager for Tennessee for Defendant. As a result, Elliott became Plaintiff's new direct supervisor. *Id.*

On July 30, 2008, Elliott visited Atchley Apartments following a fire in a resident's apartment. During his visit, Elliott and Plaintiff discussed comments residents had made to Elliott about Plaintiff interjecting religion into everyday work situations on

3

the property. Plaintiff assumed that Nagel had said something to Elliott about her, but Elliott denied receiving any information from Nagel about Plaintiff's personal religious beliefs. The conversation ended with Plaintiff agreeing that each resident is entitled to his or her religious beliefs and that Plaintiff was not to impose her religious beliefs on any resident. On August 1, 2008, Elliott provided Plaintiff with a Memorandum that detailed several issues discussed during their conversation on July 30. Defendant avers the Memorandum was not disciplinary in nature, but merely memorialized their conversation, including the following: "We discussed the necessity to separate religion and the workplace. Some individuals might find the sharing of religious beliefs a form of harassment or discrimination, so it is best that management refrain from sharing their personal beliefs when representing Atchley Apartments and American Apartment Management Company, Inc. You acknowledged your understanding of the importance to make this distinction while acting as a representative of Atchley Apartments and your employer." *Id.*

Later in August, Elliott held a meeting with all Site Managers at which he discussed the importance of documentation related to Notices of Infraction or violations of the lease or the local house rules as well as 14/30 Day letters. A 14/30 Day letter could be issued on the first business day following the fifth day of the month for the non-payment of rent giving the resident notice that he or she had until the 14th day to pay the delinquent rent or the resident would be subject to eviction if the rent was not paid by the 30th day of the month. A Notice of Infraction was issued to residents for violations of

4

house rules or lease provisions putting them on notice that future violations would subject them to eviction proceedings. A resident who received three Notices of Infraction for the same violation would then receive a 14/30 Day letter informing them of the termination of their lease for their repeated violations. Elliott asked all Site Managers to include in the subject line of any emails the name and apartment number of the resident about whom the email related so he could quickly locate prior communication relating to the same resident. *Id.*

On September 16, 2008, Elliott and Fleming met with Plaintiff at Atchley Apartments. Atchley Apartments was scheduled for an inspection by the Real Estate Assessment Center ("REAC"), a division of HUD, for the purpose of making sure the property was in good living condition for the residents. During the meeting, Plaintiff discussed with Elliott issues she was having with Mike Hall, her maintenance supervisor. Plaintiff told Elliott that Hall was resistant to her authority, had used "abusive" language, and gotten into an altercation with another maintenance worker. Elliott told Plaintiff that given the situation, if she wanted to terminate Hall, he would support that decision. Plaintiff chose to take no action with regard to Hall because he was good at his job and the REAC inspection was coming up. *Id.*

Elliott also discussed with Plaintiff a situation where a resident was allowed to move into a apartment before verification of her income, a mistake that when corrected five months later resulted in the resident's rent going from $39 per month to $309 per month. Elliott discussed with Plaintiff the importance of gaining a better understanding

5

of HUD regulations, using better time management, and developing proficiency with computer programs such as Microsoft Word and Excel. *Id.*

Plaintiff responds that when this particular resident moved in, she did not have a job and paid less rent. After becoming employed, the resident neglected to turn in her paperwork and when she did, her rent was adjusted in accordance with her income. The resident then got behind in her rent and refused to pay. The matter was taken to court and the resident was ordered to pay Defendant the rent arrearage. The resident paid the money owed by installment and she paid it in full [Doc. 32-1].

During a site visit, Plaintiff asked Fleming and Elliott to view a racial slur that had been written on her apartment door. When they arrived at her apartment, the door had recently been painted over. Plaintiff had a picture of the handwriting and claimed she knew who had written the racial slur on her door. Neither Fleming nor Elliott could determine who had written the slur, even after Fleming looked at the known handwriting of the resident Plaintiff claimed wrote the offensive language [Doc. 29].

Fleming discussed with Plaintiff an allegation that her grown children had confronted this resident and threatened her, an accusation Plaintiff would neither admit nor deny, stating only that her children "knew how to protect her." Fleming told Plaintiff that she could not have others confront residents about these issues and that without verification that the resident actually wrote the offensive language, there was nothing he could do. Plaintiff was not counseled or disciplined over this issue, but told she did the right thing in having the door repainted. *Id.* Plaintiff states that no attempt to investigate

6

the incident on her behalf ever took place, and she denies that her grown children went to any resident to defend her. [Doc. 32-1].

When Elliott and Fleming were with Plaintiff at her apartment, they noticed a sign on her door that read:

TO ALL RESIDENTS

DO NOT KNOCK ON THIS DOOR FOR ANY REASON.

PLEASE CALL THE ANSWERING SERVICE FOR EMERGENCIES
OTHERWISE YOU WILL BE EVICTED.

Fleming removed the sign and counseled Plaintiff that such a notice was inappropriate as it set the wrong tone with the residents and only a judge could evict a resident [Doc. 29]. Plaintiff responds that this notice was worded by her former supervisor, Ownby, who instructed Plaintiff to place the sign on her apartment door so tenants would not disturb her after office hours [Doc. 32-1].

On September 25, 2008, Elliott issued a Memorandum to Plaintiff to address her interaction with residents, counseling her on ways to improve her relationship with them and thereby avoid many of the problems that had been reported to him.  Elliott decided to not give Plaintiff the names of the residents who complained to avoid any possible retaliation against the residents.  Elliott also reviewed the importance of Plaintiff obtaining a better grasp of the HUD regulations and the need for her to submit all Notices of Infraction and 14/30 Day letters to him for review so he could help her satisfy those requirements and improve her performance.  Finally, Elliott offered Plaintiff additional training opportunities to help her be more efficient and effective in her job [Doc. 29].

7

In response, Plaintiff submits a letter from Diana Caldwell, former Director/Coordinator for Green Hills Apartments. Caldwell writes, "[Plaintiff] was known throughout our management team as being the person you called when you had questions pertaining to file management and what documentation was to be [placed] in resident files so when your MOR came, your property was prepared. Point of fact: [Plaintiff] scored higher on her MOR the last year she was there than anyone had ever achieved at Atchley." Caldwell further states that when Defendant terminated her employment, she was asked if she would be interested in coming back if another position became available. She was encouraged to pursue unemployment benefits and was given a letter of recommendation by Defendant. Caldwell believes that the way her termination was handled was discriminatory to Plaintiff in that Plaintiff was not asked if she would come back if another property became available, she was not advised to pursue her unemployment benefits, and she was not given a letter of recommendation by the company [Doc. 32-1].

In December 2008, Elliott issued Plaintiff her performance evaluation, noting satisfactory performance in most areas, and while giving a lower score related to her attitude and interaction with residents and management, he noted that she had shown improvement in these areas over the past 90 days [Doc. 29].

Plaintiff disagreed with her performance evaluation, commenting "Your opinion, don't agree" in the comment section. *Id.* Plaintiff explains that Elliott did the performance review after 2 visits and being her supervisor for less than a year. She

disagreed with the review because she felt she had worked hard and had turned the property around. She "loved all the residents and treated them good." Plaintiff states that during her tenure at Atchley Apartments, she was responsible for having cable and internet provided to residents, she brought the occupancy rate to 99%, and she was never written up for any violations of HUD regulations or policies. She states that Elliott got angry with her and told her to "sign the damn review" and send it to him. [Doc 32-1].

On December 19, 2008, following a managers meeting, Plaintiff states she told Elliott about certain residents calling her a "bitch nigger" and disrespecting her because they did not want to follow the rules. Plaintiff avers that Elliott and Fleming did not try to investigate these complaints with the residents. *Id.*

In January 2009, Elliott noticed that Plaintiff had two residents listed on the eviction list and did not recognize or recall any prior issues involving those residents. Elliott emailed Plaintiff to inquire about the two residents because he had not received a copy of a prior 14/30 Day letter or Notice of Infraction related to the residents. In response, Plaintiff provided an email from December 2008, inquiring about additional steps to be taken with regard to a non-payment of rent situation, something that requires the automatic issuance of a 14/30 Day letter on the first business day following the 5th day of the month if rent has not been paid. Elliott explained the procedures for pursuing eviction in a non-payment of rent situation and the procedures for violations of the lease or house rules. Elliott reminded Plaintiff that he requested that all emails regarding

residents include the name and apartment number in the subject line of the email as the December 2008 email did not contain that information [Doc. 29].

In February 2009, a resident of Atchley Apartments died in her apartment. Plaintiff went to Buildings 3, 4, 5, and 6 and asked the residents to come to a "gathering" in the community room. The residents signed in by noting their name and apartment number. Plaintiff told the residents they need to watch out for each other and take care of each other. Plaintiff also told them of a dream she had of walking into an apartment that was full of dead bodies and she did not want that to happen at Atchley Apartments. At the end of the meeting, Plaintiff prayed with the residents, during which she "spoke in tongues." *Id.*

Some residents told Elliott about Plaintiff conducting a "religious meeting" at Atchley Apartments following the death of a resident, but Elliott did not perceive the residents were making a complaint about the meeting. While he did not follow-up on the comments about the "religious meeting," Elliott did remind all Site Managers at the March managers meeting of the need to refrain from imposing their personal religious beliefs on the residents. *Id.*

On May 29, 2009, Jennifer and David Watkins, residents at Atchley Apartments, met with Nagel and Jennifer Dearholt, Marketing Manager, to complain about Plaintiff. The Watkinses complained that Plaintiff had called the police to search their apartment twice over the recent Memorial Day weekend and they wanted the harassment to stop. The Watkinses denied any drug use and stated that the police did not find any drugs

during either search of their apartment. They also complained about the February 2009 meeting, which they claimed was an attempt to impose Plaintiff's religious beliefs on them and they did not want to have to attend religious meetings with Plaintiff. They claimed they were told the meeting was mandatory, that if they did not attend, they would be evicted, and everyone was required to sign-in, all of which they felt was unfair as there was no warning of the meeting. They said it turned into a religious meeting where Plaintiff accused some of having the devil in them, Plaintiff telling the group that she knew who was evil and who "used words against her," and then Plaintiff praying and "speaking in tongues." *Id.*

Several days later, Jennifer Watkins and Melissa Goodson**,** another resident of Atchley Apartments, drove to Knoxville and met with Fleming about their complaints concerning Plaintiff. Both Watkins and Goodson claimed they were harassed by Plaintiff, falsely accused of either drugs or child abuse, and threatened with eviction. Watkins claims that when she went to the office the previous day to sign the House Rules, Plaintiff told her she was "from the fiery pits of hell" and when she returned later that day with the signed house rules, Plaintiff started singing Amazing Grace at her. *Id.*

Based on these allegations, Fleming made the decision to place Plaintiff on a paid leave of absence while he investigated the allegations. Fleming met with Plaintiff on June 4, to inform her of the allegations and let her know that she was being placed on a paid leave during the investigation and that she was to take no action with regard to any resident while she was on leave. *Id.*

11

Nagel, assisted by Dearholt, Fleming, or Brad Brazier, interviewed over a half dozen residents concerning their interaction with Plaintiff and the circumstances surrounding the February 2009 meeting. Megan Ward told them that Plaintiff said "she saw visions," she told them that "some people died here (Atchley Apts.) and everyone needs to straighten up or God is going to take them, everyone held hands and prayed." *Id.* Chastity Harris said Plaintiff "preached there would be more deaths if they did not straighten up." "[Plaintiff] pointed out certain people. She stated that God walks with her and guides her." *Id.* Brittney Gasche stated "[Plaintiff] said that the devil has Atchley Apts. But she's going to make it good." Plaintiff told Gasche that "the devil was in her" and that "God sent her a message." Daniele Bradley stated that Plaintiff said "the place was filled with serpents," "I put holy water on your door and I have blessed you," "I know everyone who's dealing pot, dealing crack, and that's because God tells me these things." Ginger Endsley stated Plaintiff "asked [residents] to pray with her [and] hold hands," "[Plaintiff] talking in tongues." *Id.*

In contrast to these reports, Plaintiff submits a letter from Lori Mendenhall, a resident at Atchley Apartments, who stated that no one ever said the February 2009 meeting was mandatory and there was no threat of eviction for not attending. No one was held against their will and anyone could leave at any time. There was no "fiery pits of hell preaching or any other kind of threats being made." It was just a tenant meeting and Plaintiff was talking about the residents getting to know one another better and suggestions on how they "could all help one another." Mendenhall stated that Plaintiff

12

"was a wonderful manager who was always there for any of us who needed her." She further described Plaintiff as "helpful and kind and would do anything for anyone who asked." [Doc. 32-1].

Defendant reported the following additional complaints about how Plaintiff treated residents. Melissa Goodson stated that Plaintiff claimed that Goodson's husband was beating their young son and doing drugs, and Plaintiff threatened to call the Department of Children's Services on her. That same day, Goodson got a call from her mother who told her that Plaintiff had called the mother at work and told her that Goodson's husband was beating their son and that he was planning to make a meth lab in the apartment [Doc. 29].

Linda Houston stated that over Memorial Day weekend, Christy Hutson's son assaulted her in her apartment and broke several of her ribs. The police were called, but Houston did not want to press charges because of Plaintiff's relationship with Hutson. When Houston told Plaintiff what happened, Plaintiff told her that "it was a police matter" and would do nothing further. *Id.* Plaintiff responds that she asked Justin (Hutson] to leave the property as a result of the altercation [Doc. 34].

After receiving these reports, Fleming sent a letter to Plaintiff asking to meet with her on June 12, 2009, to discuss the allegations and to get Plaintiff's side of the story. Plaintiff met with Fleming and Elliott. Plaintiff told them that she did not tell anyone the February 2009 meeting was mandatory or that they would be evicted if they did not come to the meeting. Plaintiff further stated she called the meeting to console the residents as a

result of the death of another resident and she wanted the residents to know that she loved them and she wanted them to watch out for each other. Plaintiff denied "preaching" to the residents or quoting Scripture, but admitted that at the end of the meeting she prayed with them and "spoke in tongues," because as she said, she "has the Holy Ghost" and "when I pray, it comes." Plaintiff stated that the door was open and residents were free to leave at any time during the meeting. Plaintiff then proceeded to describe all of the problems with various residents who lived in the buildings who were invited to the meeting, describing many as "liars" or "drug addicts." Defendant avers that Plaintiff would not address any specific allegations outside of those concerning the February 2009 meeting. *Id.*

Following the meeting, Fleming sent a questionnaire to Plaintiff asking her to respond to the specific allegations made by the residents concerning both the February 2009 meeting and her treatment of several of the residents. Fleming called Plaintiff on June 22, 2009, to follow-up on the questionnaire because he had not heard from Plaintiff and during their conversation, Plaintiff told Fleming she was not going to answer the questions [Doc. 29]. She did tell Defendant that she would not answer questions without first discussing same with her lawyer as it became apparent that the situation had escalated to the point that she felt she was going to need professional advice. [Doc. 32-1].

Between the time of the June 12, 2009 meeting with Plaintiff, and Fleming's June 22, 2009 conversation with Plaintiff about the questionnaire, Fleming learned that the

14

Department of Children's Services ("DCS") along with members of the drug task force had conducted an inspection of Melissa Goodson's apartment on June 17, 2009, based on allegations of child abuse and drug use in the apartment. Plaintiff claimed she overheard Goodson's husband talk on a cell phone about building a "meth lab" and observed him spanking Goodson's child, but denied calling DCS or the drug task force or asking anyone else to do so. Fleming and Nagel spoke with the DCS investigator who confirmed that an investigation was conducted and that the family member who called in the allegations told DCS that the original information was provided by Plaintiff. Plaintiff admits she met with Goodson's mother while she was on administrative leave and told the mother about her concerns for Goodson's child and her allegations related to the husband spanking the child. DSC took no action on the complaint, finding no evidence of child abuse and no evidence of drugs in the apartment [Doc. 29].

Fleming believed Plaintiff's actions to be in direct violation of his instructions that she take no action with regard to a resident until the investigation was completed. Having received no response to the questionnaire, Fleming sent Plaintiff another letter on June 24, asking her to respond to the questionnaire by June 26. Defendant states that Plaintiff still did not respond to the questionnaire, and Fleming made the decision to terminate Plaintiff's employment because he believed Plaintiff had engaged in unprofessional behavior in her treatment of residents at Atchley Apartments. *Id.*

Plaintiff states that Fleming and Elliott told her they had complaints and demanded "what are you going to do" (no names or what was the problem). Fleming accused her of

retaliating against the residents. Plaintiff states she had no clue what Elliott and Fleming were talking about. "They would not let her ask a question. They just found her guilty." Plaintiff states that they continued with the same accusations trying to provoke an argument with her about not knowing how to run a property and deal with residents, but never presented any information or had any resident come in with all of them together to try to resolve the issue. Plaintiff decided upon being told of the allegations and her being placed on leave with pay pending the investigation that she would not return to Atchley Apartments regardless of the outcome of the investigation. Plaintiff stated that while she was on administrative leave, one of Defendant's property managers, Alva Kinnard called her at home to answer a question. Kinnard told Plaintiff that Defendant asked her to ask residents that stopped by the office "to write things that was not true" about Plaintiff [Doc. 32].

Plaintiff further states that at no time did Defendant ever discuss with her any violations of "policies and procedures." She was never shown or had explained to her exactly which policy or procedure she allegedly violated. Plaintiff states that she is a professional and at no time did she act or react in an unprofessional manner. Plaintiff states that at no point did she attempt to obstruct Defendant's investigation, nor did she take any retaliatory action against any resident. Plaintiff states that she was never told who her accusers were nor of what she was accused. *Id.*

Plaintiff states that several times she spoke with her supervisors and told them she was getting harassed by residents, and that no attempt to investigate on her behalf ever

took place. She showed both Fleming and Elliott the photo of the racial slur written on her apartment door, but Defendant did not take any action on her behalf. [Doc. 32-1].

Plaintiff states in response to complaints pertaining to her conduct and attitude regarding religious issues, she is a Christian and that she tries to live her life both personally and professionally as a Christian. Plaintiff further states that many times residents would come to her and request prayer, and she would gladly do this in service. Plaintiff asserts she was the subject of racial and religious discrimination as the property manager and she was terminated in retaliation for complaining about problem residents. *Id.*

Plaintiff submitted a letter from former resident, Melissa Bayer, thanking her for her assistance. Bayer wrote that she and her husband had applied for many different apartments, but Plaintiff was the only one who called her back. Another resident, Mrs. Matthew Self wrote, "I have always felt safe at these apartments because of you. You have truly cleaned this place up and made Atchley Apartments a nice place to live. The grounds are always clean and well maintained, repairs are always taken care of. We have never been approached to buy or even seen drugs here, and you spray for bugs often. We have lived at other apartment complexes and never seen a manager that works as hard or cares as much about their tenants as you do."

Former resident Valerie Acosta wrote, "You taught me so much about life. You have been there for me when times were hard. You gave me strength when I needed it the most. You were the only person that didn't judge me and that meant a lot to me." *Id.*

Becky Simpson wrote a letter thanking Plaintiff for her assistance to her daughter and granddaughter, "I know that placing people in your apartments is part of your job, but somehow, I think we went above and beyond the guidelines of your job in order to place my daughter and granddaughter into your complex. I am aware of all that Debbie has done to make sure that Susan and Becca have a Merry Christmas and I know that you have played a part in helping with all of that. Thank you seems so inadequate, but I do thank you from the bottom of my heart." *Id.*

Resident Christy Hurston wrote, "[Plaintiff] came in our breezeway and smell the marijuana around the first part of May 2009. [Plaintiff] told Jennifer Watkins and David Watkins she did not want to catch that again or she would have to vacate the property. I don't know if that cause Jennifer Watkins to be in such a rage with [Plaintiff] I can not say but she [Watkins] was so disrespectful. I know [Plaintiff] as a caring manager and a Christian but have not ever seen her push herself on any one with her religion." *Id.*

Plaintiff was replaced as the Site Manager at Atchley Apartments by Geneva Satterfield, a white female, religion unknown, who was 60 years old at the time she replaced Plaintiff in July 2009 [Doc. 29]. Plaintiff states that Satterfield only worked six months, and Atchley Apartments is now run by a "younger white man." [Doc. 32].

Defendant moves for summary judgment stating that (1) Plaintiff's claim of age discrimination is barred for failure to exhaust her administrative remedies; (2) there is no evidence Defendant discriminated against or terminated Plaintiff because of her race or

her religion; and (3) there is no evidence that Defendant retaliated against Plaintiff more than two years after she allegedly made a complaint against Nagel.

In her Complaint, Plaintiff asserts she was discriminated against due to her race, religion, and age, and that she was retaliated against because of a complaint she made in 2007 against Nagel, her former supervisor, and for reporting problems with tenants. In response to Defendant's motion for summary judgment, Plaintiff responds that as the only black manager, "she was treated different from all the other white managers especially the younger managers." Plaintiff also avers that Defendants are "trying to use her religious beliefs against her." [Doc. 32-1].

## II. Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 330 n. 2 (1986); *Moore v. Philip Morris Co., Inc.,* 8 F.3d 335, 339 (6th Cir. 1993). All facts and inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita elec. Indus. Co. Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Keifer*, 301 F.3d 937, 942 (6th Cir. 2002).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations.

*Celotex*, 477 U.S. at 317. To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250.

## III. Analysis

### A. ADEA Claim

Defendant asserts that Plaintiff's claim under the Age Discrimination In Employment Act (ADEA), 29 U.S.C. § 621, *et seq.,* is barred for failure to exhaust administrative remedies because Plaintiff failed to include a charge of age discrimination in her complaint filed with the Equal Employment Opportunity Commission ("EEOC").

The filing of a charge of discrimination with the EEOC is a prerequisite to the filing of a lawsuit under the ADEA. *Jewell v. Smurfit-Stone Container Enterprises Inc.,* 2010 WL 5139261 at *2 (E.D. Tenn. 2010). A charge of discrimination is sufficient if it contains "a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." 29 C.F.R. § 1601.12(b). The purpose of filing a charge of discrimination is to trigger the investigatory and conciliatory procedures of the EEOC so that the Commission may first attempt to obtain voluntary compliance with the law. *See EEOC v. The Bailey Co Inc.,* 563 F.2d 439, 447 (6th Cir. 1977). These investigatory and conciliatory procedures notify potential defendants of the nature of plaintiffs' claims and provide them the opportunity to settle the claims before the EEOC rather than litigate them. *Id.* The general rule in the Sixth Circuit is that the judicial complaint is limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination. *Davis v. Sodexho, Cumberland College Cafeteria,* 157 F.3d 460, 463 (6th Cir. 1998); *Ang v. Proctor & Gamble Co.,* 932 F.2d 540, 545 (6th Cir. 1991). In *Davis,* the Sixth Circuit specifically held that a claim of age discrimination did not grow out of race discrimination and retaliatory discharge claims included by the plaintiff in the EEOC charge and summary. *Davis,* 157 F.3d at 463.

Plaintiff admits she failed to make any allegations of age discrimination when she submitted her Charge of Discrimination to the EEOC and that no such allegations were ever made a part of the EEOC's investigation. The face of her Charge does not contain any allegations of age discrimination and the box for a claim of age discrimination is not

marked. Plaintiff's age discrimination claim neither in fact grew out of the EEOC's investigation of race and religious discrimination and retaliation claims, nor would the facts related to these claims prompt the EEOC to investigate age discrimination. Plaintiff's Charge did not give the EEOC sufficient notice of her age discrimination claim to investigate or facilitate conciliation with her employer on that ground. On these facts, it could not reasonably be expected that an EEOC investigation of age discrimination would grow out of Plaintiff's claims of race and religious discrimination and retaliatory discharge. Accordingly, the Court finds Plaintiff's claim for age discrimination is barred for failure to exhaust administrative remedies under the ADEA, and Defendant is entitled to summary judgment on Plaintiff's claim for age discrimination.

**B. Race and Religious Discrimination/Retaliation Claims**

Defendant argues that it did not discriminate against Plaintiff based on her race or religion. Rather, Defendant contends, Plaintiff was terminated for unprofessional behavior as established by its investigation into complaints from residents at Atchley Apartments.

Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminating against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A Title VII plaintiff may satisfy her burden of establishing such discrimination either by presenting direct evidence of discriminatory actions by the defendant or by showing the existence of circumstantial evidence that creates an inference of discrimination.

Direct evidence, if believed, requires a conclusion by the fact-finder that unlawful discrimination was at least a "motivating factor" for the employer's actions. *See Wexler v. White's Fine Furniture Inc.,* 317 F.3d 564, 570 (6th Cir. 2003). In this case, Plaintiff does not offer any direct evidence of discrimination.

As Plaintiff does not offer any direct evidence of discrimination, she must rely on the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). As such, Plaintiff "bears the initial burden of demonstrating the *prima facie* elements of her Title VII claim. If she succeeds, this creates a rebuttable presumption of discrimination, and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for taking the challenged employment action." *Michael v. Caterpillar Fin. Servs. Corp.,* 496 F.3d 584, 593 (6th Cir. 2007). Only if Defendant meets this obligation does the burden shift back to the Plaintiff to "then prove the proffered reason was actually a pretext to hide unlawful discrimination." *Id.*

To establish a *prima facie* case of racial discrimination, Plaintiff must demonstrate (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that she was qualified for the position; and (4) that a similarly-situated employee outside the protected class was treated more favorably. *Younis v. Pinnacle Airlines, Inc.,* 610 F.3d 359, 363 (6th Cir. 2010). The elements are the same for Plaintiff's claim of religious discrimination. *Tepper v. Potter,* 505 F.3d 508, 515 (6th Cir. 2007).

23

With regard to her claim of discrimination, the Court finds that Plaintiff has established that she is a member of a protected class in that she is an African-American female and a professed Christian. While Defendant disputes that others outside her protected class were treated more favorably, Defendant admits for the purposes of summary judgment that Plaintiff can establish the remaining elements of her *prima facie* case (*i.e.,* she was qualified for the position and she suffered an adverse employment action).

Defendant asserts that Plaintiff was terminated for her failure to perform her duties in a professional manner as evidenced by the investigation of complaints from residents about Plaintiff's behavior. Defendant argues it could not tolerate its Site Manager telling a resident she was from "the fiery pits of hell," telling another she "had the devil in her," and making false accusations to the police about drug use. Further, when told to not take any action regarding a resident while the investigation was pending, Defendant learned that Plaintiff had contacted a family member of a complaining resident and encouraged the family member to make a report to DCS about the resident. Therefore, Defendant asserts Plaintiff's termination was well founded and based on legitimate, non-discriminatory business reasons.

Once Defendant establishes a legitimate, non-discriminatory reason for Plaintiff's discharge, it becomes Plaintiff's burden to prove, by a preponderance of the evidence, that Defendant's reason for her termination is merely a pretext for race or religious discrimination. *Kocsis v. Multi-Care Mgn. Inc.,* 97 F.3d 876, 883 (6th Cir. 1996). "More

24

specifically, a plaintiff must produce enough evidence that a jury could reasonably reject the employer's explanation for its decisions." *Id.* At this third step, a plaintiff is obligated to present evidence that (1) creates a question of material fact as to whether a defendant's proffered reasons are pretextual and (2) creates a reasonable inference that race or religion was a determinative factor in the adverse employment decision. *Forest v. Barnes Jewis Hosp.,* 2009 WL 877716 at *9 (E.D. Missouri 2009). A plaintiff may establish pretext by showing (1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the action, or (3) that the proffered reason was insufficient to motivate the action. *Kocsis,* 97 F.3d at 883. Where, as is the case here, the Court is considering a motion for summary judgment, the Court is to determine "whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell-Douglas* inquiry." *Macy v. Hopkins Cnty. Sch. Bd. Of Educ.,* 484 F.3d 357, 364 (6th Cir. 2007).

Defendant argues that Plaintiff is unable to establish pretext. Defendant states that based upon its investigation into residents' complaints against Plaintiff, it reasonably believed Plaintiff had engaged in unprofessional behavior and took disciplinary action accordingly. Defendant relies upon the "honest belief" rule to argue against a finding of pretext. Defendant argues it is not concerned with whether Plaintiff actually undertook the inappropriate actions, but rather that Defendant honestly believed Plaintiff did those things and said belief was reasonable.

Under the honest belief rule adopted by the Sixth Circuit, "for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Wright v. Murray Guard Inc.,* 455 F.3d 702, 708 (6th Cir. 2006). Even when the employer makes such a showing, the protection afforded by the rule is not automatic. "Once the employer is able to point to the particularized facts that motivated its decision, the employee has the opportunity to produce proof to the contrary." *Id.*

To determine whether an employer "reasonably relied on the particularized facts then before it, [courts] do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* Therefore, "when the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process unworthy of credence, then any reliance placed by the employer in such a process cannot be said to be honestly held." *Id.* at 807-08.

There is sufficient proof in this record for a factfinder to infer that Defendant failed to make a reasonably informed and considered decision when relying on its investigation to justify the termination of Plaintiff. Plaintiff, acting *pro se,* has presented evidence that after less than one year as an Assistant Site Manager at Green Hills

26

Apartments, she was promoted to Site Manager at Atchley Apartments. Plaintiff has also presented evidence that she had a contentious relationship with Nagel and she believes that Nagel wanted Defendant to terminate her. In fact, after a confrontation, Ownby removed Nagel as Plaintiff's supervisor and assumed supervision of Plaintiff herself. As to Defendant's allegation that Plaintiff allowed a resident to move into Atchley Apartments without verification of income, Plaintiff has explained that when the resident made her application, she was not employed and her rent was set accordingly. Once Plaintiff learned that this resident had become employed, Plaintiff adjusted the rent in accordance with the resident's income. When the resident got behind in her rent and refused to pay, Plaintiff initiated legal proceedings which resulted in Defendant collecting the arrearage.

In addition, when Plaintiff reported to Fleming and Elliott that a racial slur had been written on her door and that residents were calling her a "bitch nigger" and disrespecting her because they did not want to follow the rules, Defendant did not try to investigate these complaints with the residents. Defendant also relies on a sign posted on Plaintiff's apartment door warning residents not to knock after hours or risk eviction as evidence of her lack of professionalism, but Plaintiff has explained that this notice was worded by her former supervisor, Ownby, who instructed her to place the sign on her door.

In support of her argument that she was an effective manager at Atchley Apartments, Plaintiff submits a letter from Diana Caldwell, former Director for Green

27

Hills Apartments. Caldwell states that "[Plaintiff] was known throughout our management team as being the person you called when you had questions pertaining to file management and what documentation was to be [placed] in resident files so when your MOR came, your property was prepared." Caldwell further states that Plaintiff scored higher on her MOR the last year she was there than anyone had ever achieved at Atchley Apartments.

Plaintiff states that during her tenure at Atchley Apartments, she brought the occupancy rate to 99% and she was never written up for any violations of HUD regulations or policies. Melissa Bayer, a resident, wrote that Plaintiff "truly cleaned this place up and made Atchley Apartments a nice place to live. The grounds are always clean and well maintained, repairs are always taken care of." Former resident Valeria Acosta wrote about Plaintiff, "You have been there for me when times were hard . . . You were the only person that didn't judge me and that meant a lot to me." Becky Simpson, mother of a resident wrote, "I know that placing people in your apartments is part of your job, but somehow, I think we went above and beyond the guidelines of your job in order to place my daughter and granddaughter into your complex."

As to the February 2009 meeting following a resident's death, Plaintiff submits evidence that conflicts with the reports obtained by Defendant. Lori Mendall wrote that no one ever said the meeting was mandatory and there was no threat of eviction for not attending. No one was held against their will and anyone could leave at any time. There was no preaching or any other threats being made. She relates that Plaintiff was talking

about the residents getting to know one another and looking out for each other. Plaintiff denies "preaching" to the residents or quoting Scripture, but admits that at the end of the meeting she prayed with residents who chose to do so. Resident Christy Hurston wrote "I know [Plaintiff] as a caring manager and a Christian but have not ever seen her push herself on any one with her religion."

During her discussions with Fleming and Elliott, Plaintiff testified that they would not tell her specifically what the residents' complaints were against her and refused to give her the names of the complaining residents. Plaintiff states that they never tried to have a meeting with Plaintiff and the complaining residents to resolve the issues prior to placing her on administrative leave and ultimately terminating her.

The Court notes that in the investigation, Defendant interviewed a half dozen residents in an apartment complex containing over 124 apartments. Plaintiff's response to the motion for summary judgment states these residents are the same ones Plaintiff had issues with regarding the complex's lease terms and house rules. The letter from resident Christy Hurston relates an incident when "[Plaintiff] came in our breezeway and smell the marijuana around the first part of May 2009. [Plaintiff] told Jennifer Watkins and David Watkins she did not want to catch that again or she would have to vacate the property. I don't know if that cause Jennifer Watkins to be in such a rage with [Plaintiff] I can not say but she [Watkins] was so disrespectful." In addition, while she was on paid administrative leave, Plaintiff reports that Alva Kinnard called her at home to answer a

question. Kinnard told Plaintiff that Defendant asked her to ask residents that stopped by the office "to write things that was not true" about Plaintiff.

At the summary judgment stage, the Court is to determine whether there is sufficient evidence to create a genuine issue of material fact to proceed to trial. *Macy v. Hopkins Co. Sch. Bd. Of Ed.,* 484 F.3d 357, 364 (6th Cir. 2007). Viewing the above facts in a light most favorable to Plaintiff, a factfinder could conclude that Defendant's stated reason for Plaintiff's termination is pretext. Plaintiff has presented evidence which establishes a question of fact regarding Defendant's motivation for her termination. Since the trial court is not to resolve issues of fact in deciding a motion for summary judgment, the determination of whether these circumstances give rise to an inference of retaliation must be determined at trial. It is not the province of the court to decide what inferences should be drawn from the evidence. *Southmayd v. Apria Healthcare Inc.,* 412 F. Supp. 2d 848, 862-63 (E.D. Tenn. 2006). Accordingly, the Court finds that Defendant is not entitled to summary judgment on Plaintiff's claim that she was terminated based on racial and/or religious discrimination and the motion is **DENIED.**

Moreover, the Court finds that Plaintiff has alleged sufficient facts to proceed on a hostile work environment claim based on her race and/or religion. In *Meritor Savings Bank FSB v. Vinson,* 477 U.S. 57 (1986), the Supreme Court held that harassment so "severe or pervasive" as to "alter the conditions of employment and create an abusive working environment" violates Title VII. *Id.* at 67.

To succeed on a hostile work environment claim, Plaintiff must show that the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993). The Supreme Court has set forth several factors to consider: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employees' work performance. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998). The determination of whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment "is not susceptible to a mathematically precise test." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008). Under the totality of the circumstances test, "the issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether – taken together – the reported incidents make out such a case." *Williams v. Gen. Motors Corp.,* 187 F.3d 553, 562 (6th Cir. 1999). Whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is "quintessentially a question of fact." *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006). Courts are instructed to examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the alleged harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abuse working environment. *Harris,* 510 U.S. at 23.

31

At the summary judgment stage, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, as they have here, the Court may not decide which evidence to believe, by determining which party is more credible; rather, credibility determinations must be left to the factfinder at trial. 10A Wright, Miller & Krane, Federal Practice and Procedure Civil 3d § 2276 (1998).

It may well be that at trial, a factfinder would conclude that Plaintiff was not subjected to harassment that was sufficiently severe or pervasive to create a hostile work environment. Because the inquiry is so fact intensive and contextually specific, however, Plaintiff's allegations certainly meet the threshold of what is required for the case to proceed to trial. *See Sparks v. Pilot Freight Carriers, Inc.*. 830 F.2d 1554, 1561 (11th Cir. 1987) ("With access to all the evidence, and with the common sense to make credibility determinations, a factfinder should not find it difficult to distinguish between harassing actions that constitute a violation of Title VII and those 'ambiguous' actions which simply may not create an abusive work environment"). Accordingly, the Court finds that Plaintiff has met the threshold for asserting a claim under Title VII, and Defendants' motion for summary judgment as to Plaintiff's claim of a hostile work environment under Title VII is denied.

**IV.    Conclusion**

For the reasons stated herein, the Court hereby **GRANTS in part and DENIES in part** Defendants' motion for summary judgment [Doc. 28] as follows:

1.    Defendant's motion for summary judgment as to Plaintiff's claim for age discrimination is **GRANTED**, and that claim is **DISMISSED.**

2.    Defendants' motion for summary judgment as to Plaintiff's claims brought under Title VII for racial and religious discrimination as well as for retaliation is **DENIED.**

3.    The parties shall file a report indicating their respective positions regarding whether this matter is suitable for mediation, as defined by Local Rule 16.4, within ten days.

**IT IS SO ORDERED.**

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE